572 A.2d 6

**Maurice T. FOLEY, Appellant,**

v.

**Catherine A. FOLEY, Appellee.**

Superior Court of Pennsylvania.

Argued Sept. 20, 1989.

Filed Feb. 26, 1990.

Reargument Denied April 5, 1990.

Donald W. Grieshober, Erie, for appellant.

William Hain, Erie, for appellee.

Before McEWEN, POPOVICH and MONTGOMERY, JJ.

McEWEN, Judge:

Appellant has taken this appeal from the order which granted appellee/wife's petition to vacate a divorce decree entered January 16, 1987. We affirm.

Appellant/husband has in his brief adequately summarized the procedural history underlying this appeal:

Appellant, Maurice T. Foley, and appellee, Catherine A. Foley, were married on April 17, 1976. On April 16, 1976, they signed a pre-marital agreement which is designated as defendant's Exhibit D and which is attached to appellee's brief in support of her petition to vacate the divorce decree. No children were born of their marriage. Appellant filed a complaint in divorce under Section 201(c) of the Divorce Code on September 15, 1986 and the same was served on appellee on September 16, 1986 and contained the required notice to defend and claim rights. On October 3, 1986, appellant and appellee signed a property settlement agreement which was not attached to nor incorporated with the divorce decree. On December 31, 1986, appellee signed an acceptance of service document

to clarify matters relating to the service upon her of the divorce complaint. On December 31, 1986, the required affidavits of consent under Section 201(c) of the Divorce Code, signed on December 29, 1986 by both appellant and appellee, were filed. There were no other pleadings filed to the date of the entry of the divorce decree by either appellant or appellee. On January 16, 1987, a decree of divorce was entered under Section 201(c) of the Divorce Code.

On April 25, 1988, appellee filed a petition to open the decree of divorce. On May 2, 1988, preliminary objections were filed to said petition by appellant. On May 23, 1988, trial was held before Honorable Michael T. Joyce. On June 2, 1988, both the brief of appellant and the brief of appellee with attached exhibits were filed with the court. On February 14, 1989, [the] trial court filed its opinion and order vacating the divorce decree.

Appellant argues that the trial court erred when it granted the petition to vacate the divorce decree essentially because (1) appellee waived any grievance by her failure to respond, or otherwise plead, or to present any claim during the pendency of the divorce proceeding and instead waited fifteen months after entry of the divorce decree to do so, and (2) appellee failed to establish that appellant had engaged in the extrinsic fraud which is a condition precedent to vacating a decree in divorce.

■ The initial argument of appellant focuses upon the interplay of Divorce Code Sections 401(c), 401(j), and 102. It is to be emphasized at the outset that the legislature, in Section 401(c), expressly granted the trial court broad equity powers in divorce proceedings:

(c) In all matrimonial causes, the court shall have full equity power and jurisdiction and may issue injunctions or other orders which are necessary to protect the interests of the parties or to effectuate the purposes of this act, and may grant such other relief or remedy as equity and justice require against either party or against any third person over whom the court has jurisdiction and

who is involved in or concerned with the disposition of the cause.

Thus, despite appellant's initial claim that section 401(j) [1] of the Divorce Code precludes the retention by the court of jurisdiction over "any economic matters" following the entry of a divorce decree, the expansive terms of section 401(c) itself demonstrate with certainty that the equitable powers of the court are to survive the divorce decree.[2] Moreover, it is the stated intent and policy of the Divorce Code of the Commonwealth of Pennsylvania to, *inter alia,* "effectuate economic justice between parties who are divorced or separated and grant or withhold alimony according to the actual need and ability to pay of the parties and insure a fair and just determination and settlement of their property rights." 23 P.S. § 102(a)(6). In summary, then, the courts of this Commonwealth are empowered under section 401(c) to intercede upon petition by the aggrieved party to address and correct economic injustice. Appellant's claim that section 401(j) precludes such an intervention by the court is unpersuasive in the face of the certain terms of section 401(c), especially when considered in light of the legislative intent proclaimed in section 102(a)(6) of the

1. Section 401(j) provides:

   Whenever a decree or judgment is granted which nullifies or absolutely terminates the bonds of matrimony, any and all property rights which are dependent upon such marital relation, save those which are vested rights, are terminated unless the court otherwise expressly provides in its decree in accordance with subsection (b) or (b.1). All duties, rights, and claims accruing to either of said parties at any time heretofore in pursuance of the said marriage, shall cease and the parties shall, severally, be at liberty to marry again in like manner as if they had never been married, except where otherwise provided by law. 23 P.S. § 401(j)

2. The fundamental goal of finality inspired the equitable doctrine of estoppel and is mirrored in the maxim that "You may not sleep on your rights". Appellee did not here sleep upon her rights. Rather, she was paralyzed by appellant's threats of harm. "Fear flees in the face of reason and resolve, but terror vanquishes all". (Vincent J. Dougherty, "From Mighty to Minion", March 16, 1982). The law, not appellant, would be the villain were, upon this record, the trial court, or this Court, to give heed to the form of appellant's argument and ignore the substance of the intimidation of which appellee had been victim.

Divorce Code. Thus, the trial court had the authority under the law to intercede on behalf of appellee were an injustice to so warrant.

Appellant also argues that there was insufficient evidence to establish extrinsic fraud under section 602 of the Divorce Code. The record, however, demonstrates that the treatment inflicted upon appellee by appellant and the intimidation effected thereby certainly composed extrinsic fraud as that concept is defined in Section 602 of the Code. The legislature in Section 602 of the Code described the circumstances under which the trial court may proceed to the exercise of its equitable power, and specifically referred to the notion of extrinsic fraud:

### § 602. Opening or vacating divorce decrees

A motion to open a decree of divorce or annulment may be made only within 30 days after entry of the decree and not thereafter. Such motion may lie where it is alleged that the decree was procured by intrinsic fraud or that there is new evidence relating to the cause of action which will sustain the attack upon its validity. A motion to vacate a decree or strike a judgment alleged to be void because of extrinsic fraud, lack of jurisdiction over the subject matter or because of a fatal defect apparent upon the face of the record, must be made within five years after entry of the final decree. Intrinsic fraud is such as relates to a matter adjudicated by the judgment, including perjury and false testimony, whereas extrinsic fraud relates to matters collateral to the judgment which have the consequence of precluding a fair hearing or presentation of one side of the case.

Since more than fifteen months had elapsed between the date of the divorce decree and the date of the petition to open the decree, the trial court was empowered to exercise its equitable powers only if appellee demonstrated that appellant had secured the decree through the use of extrinsic fraud. Thus, we are obliged to determine the precise meaning of extrinsic fraud, and then examine the record to

determine if appellee sustained her burden of demonstrating that she was the victim of appellant's extrinsic fraud.

The distinction between extrinsic fraud, i.e., fraud which relates to a collateral matter of consequence of which is to prevent a fair hearing, and intrinsic fraud, i.e., a matter relating to the adjudication of the judgment, was defined by the court in *McEvoy v. Quaker City Cab Co.*, 267 Pa. 527, 536, 110 A. 366, 368 (1920):

> By the expression 'extrinsic or collateral fraud' is meant some act or conduct of the prevailing party which has prevented a fair submission of the controversy. Among these are the keeping of the defeated party away from court by false promise of compromise, or fraudulently keeping him in ignorance of the action. Another instance is where an attorney without authority pretends to represent a party and corruptly connives at his defeat, or where an attorney has been regularly employed and corruptly sells out his client's interest. The fraud in such case is extrinsic or collateral to the question determined by the court. The reason for the rule is that there must be an end to litigation; and, where a party has had his day in court and knows what the issues are, he must be prepared to meet and expose perjury then and there: *Pico v. Cohn*, 91 Cal. 129 [25 P. 970]. Where the alleged perjury relates to a question upon which there was a conflict, and it was necessary for the court to determine the truth or falsity of the testimony, the fraud is intrinsic and is concluded by the judgment, unless there be a showing that the jurisdiction of the court has been imposed upon, or that by some fraudulent act of the prevailing party the other has been deprived of an opportunity for a fair trial. *Bleakley v. Barclay*, 75 Kansas 462 [89 P. 906].

*Fenstermaker v. Fenstermaker*, 348 Pa.Super. 237, 243, 502 A.2d 185, 188 (1985), *quoting McEvoy v. Quaker City Cab Co.*, 267 Pa. 527, 536, 110 A. 366, 368 (1920).

The trial court found that the actions of appellant did intimidate appellee to the extent that she was fearful of

undertaking any effort to secure the economic justice to which she was entitled, and concluded that because she was thereby denied an opportunity for a fair trial, appellee had established the existence of extrinsic fraud. The trial judge stated:

> In the instant case it appears that a great deal of influence must have been exerted upon the Defendant to obtain the result that presently stands. Defendant, after eleven years of marriage, received essentially only $1,500.00 and her personal clothing, while Plaintiff received property said to be worth $200,000.00 and everything else that arose from the marital relationship. The parties did enter into a marital property settlement agreement, however, that agreement purports to give with few exceptions all property, marital or otherwise to Plaintiff. This arrangement is unconscionable and cannot be accepted by the Court as a knowing, informed and freely given exchange by the Defendant. Therefore, in order to effect a fair and just determination and settlement of Plaintiff's and Defendant's property rights this Court will allow Petitioner to proceed by granting her Petition to Vacate Divorce Decree.

"A proceeding to open a divorce decree is equitable in nature, and the appellate court will not reverse an order entered in such a proceeding unless there has been a clear abuse of discretion." *Masciulli v. Masciulli,* 194 Pa.Super. 646, 169 A.2d 562 (1961) (citations omitted). There is no basis for this Court to conclude that the decision of the trial judge was an abuse of discretion. There was an ample factual basis for the finding of intimidation, as well as for the conclusions that because she had been denied a fair trial, she had established such extrinsic fraud as to justify vacating the decree in divorce.

Order affirmed.

MONTGOMERY, J., joins.

POPOVICH, J., files a dissenting opinion.

POPOVICH, Judge, dissenting.

While I agree with the implicit holding of the majority that duress may be extrinsic fraud, I reject the majority's determination that appellant's actions amounted to extrinsic fraud which precluded a fair hearing or presentation of appellee's case. Rather, I would find that under the facts before us, viewed in a light most favorable to the verdict winner, the trial judge abused his discretion in vacating the divorce decree. *Masciulli v. Masciulli*, 194 Pa.Super. 646, 169 A.2d 562 (1961) (standard of review). This is not to say that appellee is without an avenue of redress since an action in assumpsit to invalidate the settlement agreement and seek damages remains.[1]

The majority correctly cites *Fenstermaker v. Fenstermaker*, 348 Pa.Super. 237, 502 A.2d 185, 188 (1985), which, quoting *McEvoy v. Quaker City Cab Co.*, 267 Pa. 527, 536, 110 A. 366, 368 (1920), reiterates the time-honored distinction between extrinsic fraud and intrinsic fraud as follows:

> By the expression 'extrinsic or collateral fraud' is meant some act or conduct of the prevailing party which has prevented a fair submission of the controversy. Among these are the keeping of the defeated party away from court by false promise of compromise, or fraudulently keeping him in ignorance of the action. Another instance is where an attorney without authority pretends to represent a party and corruptly connives at his defeat, or where an attorney has been regularly employed and corruptly sells out his client's interest. The fraud in such case is extrinsic or collateral to the question determined by the court. The reason for the rule is that there must be an end to litigation; and, where a party has had his

---

1. The parties entered into a settlement agreement which was neither incorporated nor merged into the decree, and, consequently, appellee may still proceed in assumpsit. *Caccavo v. Caccavo*, 388 Pa.Super. 459, 463, 565 A.2d 1199, 1201 (1989) (a property settlement agreement not incorporated and merged into a divorce decree, it is not subject to modification pursuant to the provisions of the divorce code, but rather is governed by the law of contract); *McFadden v. McFadden*, 386 Pa.Super. 506, 510 n. 1, 563 A.2d 180, 182 n. 1 (1989); *Sonder v. Sonder*, 378 Pa.Super. 474, 492, 549 A.2d 155, 165 (1988) (en banc).

day in court and knows what the issues are, he must be prepared to meet and expose perjury then and there: *Pico v. Cohn,* 91 Cal. 129 [25 P. 970]. Where the alleged perjury relates to a question upon which there was a conflict, and it was necessary for the court to determine the truth or falsity of the testimony, the fraud is intrinsic and is concluded by the judgment, unless there be a showing that the jurisdiction of the court has been imposed up, or that by some fraudulent act of the prevailing party the other has been deprived of an opportunity for a fair trial. *Bleakley v. Barclay,* 75 Kansas 462 [89 P. 906].

*Fenstermaker,* 502 A.2d at 188.

Appellee alleged that appellant's actions in procuring the divorce and settlement agreement amounted to duress which precluded her from seeking counsel and fully litigating the economic issues. Thus, the threshold question *sub judice* is whether duress falls under the definition of extrinsic fraud. Implicit in the majority's decision is a holding that duress constitutes extrinsic fraud. Though I agree, I do so with some trepidation because my research of Pennsylvania case law has not revealed a single case where duress has been the reason a divorce decree was vacated (or opened).

Traditionally, extrinsic fraud has been found in the following situations: When a party is kept away from court by a promise of false compromise, *Fenstermaker, supra* (husband promised to complete on going settlement negotiations but did not after divorce decree was entered, decree vacated, wife allowed to litigate economic issues); when a party fraudulently assumes a residence to meet jurisdictional requirements, *Nickerson v. Nickerson,* 18 W.N.C. 210 (1883) (husband fraudulently assumed Pennsylvania residence to meet jurisdictional requirement; decree vacated); when a party is kept in ignorance of the action because notice was fraudulently withheld, *Nickerson, supra* (wife sent overseas by husband, husband then divorced wife on grounds of desertion, wife did not receive notice, decree

vacated upon wife's learning of divorce), *Masciulli, supra* (husband fraudulently concealed wife's whereabouts, wife did not receive notice, decree vacated upon wife's petition), *Cortese v. Cortese*, 163 Pa.Super. 553, 63 A.2d 420 (1949) (husband deprived wife of notice, decree vacated); and when defendant had notice of suit but was kept away by plaintiff's representation that suit had been discontinued, *Fidelity Ins. Co.'s Appeal*, 93 Pa. 242 (1880). See also Freedman, *Law of Marriage and Divorce in Pennsylvania* (2nd Ed., Vol. 3, 1957) § 724; *Pennsylvania Matrimonial Practice*, § 35:3.

However, relief will not be afforded where the failure to defend is not caused by the fraud of the plaintiff, but is actually the fault of the defendant. See e.g., *Catts v. Catts*, 35 Pa.Super. 293 (1908) (respondent who directed her attorney to withdraw his appearance and then refrained from defending, although fully advised by her attorney of the consequences, cannot subsequently maintain she was denied a fair hearing); *Knode v. Knode*, 159 Pa.Super. 210, 48 A.2d 151 (1946) (defendant who intentionally conceals her residence, thus preventing him from giving notice, cannot maintain she was denied a fair trial); *Taylor v. Taylor*, 52 Pa.Super. 388 (1913) (defendant who knows of proceedings cannot excuse her failure to defend by the claim of her husband's threat to institute a criminal action for adultery if she defended the divorce suit). In such cases, the defendant had every opportunity to appear and expose the allegedly fraudulent testimony of the plaintiff at the time of the suit but did not. But see, *Teriberry v. Teriberry*, 210 Pa.Super. 54, 232 A.2d 201 (1967) (wife appeared at trial and requested a continuance because her counsel could not appear, request denied, divorce entered, court applied equity power and opened divorce to allow wife her day in court).

Despite the dearth of Pennsylvania case law in support of the majority's opinion, I recognize that the Legislature by defining extrinsic fraud extremely broadly—"... matters collateral to the judgment which have the consequence of precluding a fair hearing or presentation of one side of the

case"—in all likelihood intended it to encompass duress which precluded a party from defending. However, whether duress precluded a fair submission of the controversy should be determined on a case by case basis.[2]

Instantly, I do not believe that appellee demonstrated that appellant's actions prevented her from coming forward with a defense. Appellee contends that she refrained from retaining counsel because of her husband's threats and that she was coerced into signing the documents without the advice of counsel. Appellee testified appellant "ordered" her not to see an attorney. (N.T., p. 12) She contends appellant would make statements to the effect that "people in his state of mind have murdered their family. They've shot their wives." (N.T., p. 15) She stated appellant threatened "to tell a lot of my personal business . . . [to] people I didn't want to know, especially my children." (N.T., pp. 17–18) Appellee testified that on one occasion, appellant "hit [her] with an open hand." (N.T., p. 15) Appellee also alleged that appellant ran her off the road while she was driving her car, and that he wrote a biblical message concerning adultery on her bathroom mirror. (N.T., pp. 15, 13) In addition, after the date of separation, appellant, on several occasions, stayed at the marital residence over appellee's objection.

I believe, however, that appellee's argument is belied by the evidence. At the hearing on her petition to vacate, appellee admitted she received notice of every aspect of the divorce proceeding, and she consented to the divorce. In fact, appellee stated that it was she who first asked for a

**2.** Analogizing to contract law, "[d]uress has been defined as that degree of restraint or danger, either actually inflicted or threatened and impending, which is sufficient in severity or apprehension to overcome the mind of a person of ordinary firmness. . . . The quality of firmness is assumed to exist in every person competent to contract, unless it appears that by reason of old age or other sufficient cause he is weak or infirm. . . . Moreover, in the absence of threats of actual bodily harm there can be no duress where the contracting party is free to consult with counsel." *Young v. Pileggi,* 309 Pa.Super. 565, 455 A.2d 1228 (1983); *Carrier v. William Penn Broadcasting Co.,* 426 Pa. 427, 233 A.2d 519 (1967), quoting from *Smith v. Lenchner,* 204 Pa.Super. 500, 205 A.2d 626 (1964).

divorce. (N.T., p. 11) Further, appellee admitted "[she] was going with a man before the divorce was entered." (N.T., p. 30)

Appellee does not contend that she was mislead as to the extent of the marital estate. Although she contends she did not read the agreement and was coerced into signing, appellee admits she signed the settlement agreement before a notary public. In her affidavit of consent to the divorce filed on December 31, 1986, appellee specifically stated "I understand that I may lose rights concerning alimony, division of property, lawyer's fees or expenses if I do not claim them before a divorce is granted." The parties also had entered into a premarital agreement which provided that all properties owned by the individual's prior to the marriage would not become marital property.[3]

Significantly, appellee admitted she knew well before the divorce was entered that she should seek the advise of counsel. (N.T., p. 23) She also admitted to receiving a letter from appellant's counsel directing her to consult counsel before entering into the settlement agreement. And, when questioned by the court, appellee admitted that she was familiar with the divorce process as she had previously been divorced and had many divorced friends. (N.T., 43) Appellee even knew that after the divorce petition was filed, she could speak to an attorney about her rights because "the divorce was not final yet." (N.T., p. 36)

When reviewing the evidence presented in a petition to vacate a divorce decree on the ground of duress, we should be cognizant of the acrimonious nature of divorce. Obviously, these parties no longer cared for one another. However, viewing her testimony in its best light, appellee failed to demonstrate abusive behavior on the part of the appellant. Appellant never directly threatened to harm appellee physically, and one slap does not rise to the level of abuse. Moreover, appellee did not allege a pattern of abuse which would lend credibility to her allegations.

---

**3.** Appellant's primary asset, an auto race track, was purchased prior to the marriage.

Based on the facts adduced below, I am convinced that a person of ordinary sensibility would not have refrained from seeking counsel because of appellant's actions. Granted this divorce was splenetic in nature, but appellee knew she should seek counsel and had every opportunity to defend in this action. I see no reason why fifteen months after entry of the divorce decree appellee should be allowed to escape its effect.